**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 23 1997**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JON BRADLEY SUMMERS; GLYN E.
POTTS,

      Plaintiffs - Appellants,

v.

      No. 96-7038

MISSOURI PACIFIC RAILROAD
SYSTEM,

      Defendant - Appellee.

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. CV-94-468-P)**

---

Edward J. Kionka, Carbondale, Illinois, for Plaintiffs - Appellants.

David Lee Crawford, Houston, Texas, for Defendant - Appellee.

---

Before **TACHA**, and **LUCERO**, Circuit Judges, and **DANIEL** [*], District Judge.

---

**LUCERO**, Circuit Judge.

---

[*]The Honorable Wiley Y. Daniel, United States District Judge for the District of Colorado, sitting by designation.

-1-

This action arises under 49 U.S.C. § 20701[1] and the Federal Employers Liability Act ("FELA"), 45 U.S.C. §§ 51-60. Plaintiffs Jon Bradley Summers and Glyn E. Potts, while "deadheading"[2] in the service of their employer, defendant Missouri Pacific Railroad System, allegedly sustained personal injuries which ultimately led to their claims, trial and a jury verdict for defendant. We are asked to consider whether the district court abused its discretion in excluding plaintiffs' expert witnesses and denying their motion for a new scheduling order, and whether the jury was correctly instructed. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part and reverse in part.

**I**

In June 1993, while traveling from Oklahoma to Texas in the second engine of a four-engine locomotive, plaintiffs noticed diesel exhaust in the cab. Summers complained of a headache, weakness, dizziness, nausea and difficulty breathing, and Potts experienced a headache, difficulty breathing and tightness in the chest. They notified the dispatcher, exited the train, and sought medical care. Although treated and released, the

---

[1]This provision was formerly part of the Boiler Inspection Act ("BIA") and was codified at 45 U.S.C. § 23. The BIA was subsequently repealed and its provisions recodified. See Act of July 5, 1994, Pub. L. No. 103-272, § 7(b), 108 Stat. 745. The substance of the BIA remains unchanged by the recodification. See H.R. Rep. 103-180, at 818 (1994), reprinted in 1994 U.S.C.A.A.N. 818, 818.

[2]"Deadheading" is the practice whereby train crews are transported from one location to another, usually, as in this case, from the place of destination back to their point of origin or home location. While being transported in this fashion, employees such as plaintiffs are merely passengers and do not serve as working crew members.

men continued to experience health problems. Defendant referred plaintiffs to the Environmental Health Center in Dallas where they were treated by Dr. Alfred Johnson. Dr. Johnson's diagnosis was toxic exposure to diesel fumes resulting in injury to the central nervous and respiratory systems, causing "chemical sensitivity." Appellants' App. at 455, 522-23. In Dr. Johnson's opinion, this condition rendered plaintiffs totally and permanently disabled with respect to railroading and most other types of employment. Id. at 457-58, 478-79, 482-83.

Thereafter, plaintiffs were referred by defendant to Dr. Thomas Chester, who concluded that their exposure to diesel exhaust had resulted only in moderate carbon monoxide poisoning. Id. at 52-53, 63. In his opinion, the effects of such poisoning dissipate within a few days and, consequently, the incident at issue could not have caused plaintiffs' chronic problems. Id. at 54, 58-59, 61. Dr. Chester determined that Potts was unable to return to work for health-related reasons unrelated to the incident in question. With respect to Summers, Dr. Chester thought it possible that he was suffering from depression, not toxic exposure. Accordingly, he recommended neuropsychological testing, and for that purpose referred Summers to Dr. Susan Franks. Dr. Franks examined Summers and, while refusing to diagnose the cause of his condition, found he "was experiencing a probable dementia that was consistent with a toxic exposure," id. at 714, and was "brain-damaged," id. at 718.

Prior to trial, defendant filed a motion in limine to exclude the testimony of Drs. Johnson and Franks. Shortly after the district court granted that motion, plaintiffs filed a motion for a new scheduling order to procure additional time to obtain alternative medical testimony. Four days later, plaintiffs were examined by Dr. David Schreiber. Plaintiffs then submitted Dr. Schreiber's reports to the district court, as well as railroad retirement board medical reports prepared by Drs. Thomas Trese and Gordon McWatt. In addition, they requested that these three doctors be added to the witness list and that the district court grant them an additional 90 days of discovery. The court denied the motion.

Plaintiffs appeal the district court's rulings as to both motions. In addition, plaintiffs contend that the district court improperly instructed the jury on the issue of causation.

## II

For most of this century, district courts, charged with admitting or excluding scientific evidence at trial, were guided by the "general acceptance" test set forth in Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923). The test required excluding such evidence whenever its underlying scientific principles were not "sufficiently established to have gained general acceptance in the particular field in which [they belong]." Id. The Supreme Court has overturned this "dominant standard," holding that the adoption of the Federal Rules of Evidence has superseded Frye. Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579, 585, 587 (1993).

A district court's decision to admit or exclude expert testimony pursuant to Daubert is reviewed for abuse of discretion. General Elec. Co. v. Joiner, No. 96-188, 1997 WL 764563, at *7 (U.S. Dec. 15, 1997); see also Compton v. Subaru of America, Inc., 82 F.3d 1513, 1517 (10th Cir. 1996). We will not disturb the trial court's determination "absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." Cartier v. Jackson, 59 F.3d 1046, 1048 (10th Cir. 1995).

Under Daubert, when faced with a proffer of expert scientific testimony, a district court "must determine at the outset, pursuant to [Fed. R. Evid.] 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 592.[3] When district courts employ this standard, they ensure the proffered evidence is not only relevant, but reliable. See id. at 589. In particular, "scientific knowledge" tests reliability, whereas the second element, helpfulness to the trier of fact, evaluates relevancy. Reliability is verified by assessing "whether the reasoning or methodology underlying the testimony is

---

[3]The standard articulated by the Court is simply a restatement of Rule 702, which provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. The Court referred to Rule 104(a) in order to explain that in making this preliminary determination, district courts are not bound by the rules of evidence except those with respect to privileges, and need only be persuaded by a preponderance of the proof. See Fed. R. Evid. 104(a); Bourjaily v. United States, 483 U.S. 171, 175-76 (1987).

scientifically valid." Id. at 592-93.[4]  Relevance is determined by ascertaining "whether [that] reasoning or methodology properly can be applied to the facts in issue." Id. at 593.[5]

Plaintiffs were diagnosed by Dr. Johnson as having "chemical sensitivity." Appellants' App. at 455, 522-23.  Defendant concedes that "chemical sensitivity" is a recognized scientific diagnosis. Id. at 127.  Defendant argues, however, that although Dr. Johnson uses the words "chemical sensitivity," he is not in fact making that diagnosis, but is instead applying a scientifically valid label to a scientifically invalid diagnosis of "multiple chemical sensitivity" ("MCS").  If defendant's contentions are true, defendant prevails because MCS is a controversial diagnosis that has been excluded under Daubert as unsupported by sound scientific reasoning or methodology.  See Bradley v. Brown, 42 F.3d 434, 438-39 (7th Cir. 1994); see generally, Kenneth R. Foster & Peter W. Huber, Judging Science: Scientific Knowledge and the Federal Courts 59 (1997) ("Chemical

---

[4]Several nondispositive factors should be considered when measuring the reliability of a particular scientific theory or technique: whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has attained general acceptance in the pertinent scientific community.  See Daubert, 509 U.S. at 593-94; Compton, 82 F.2d at 1518.  In considering these factors, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.

[5]With respect to assessing relevance, "the district court must determine whether the methodology or reasoning underlying the expert opinion relates to the issue at hand, i.e., whether it assists the trier of fact in understanding the evidence or a fact in issue.  In this regard, the Daubert Court discusses the concept of 'fitness,' that is, whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Joiner v. General Elec. Co., 78 F.3d 524, 530 (11th Cir. 1996) (internal quotation and citations omitted).

ecologists have failed to provide criteria that allow a doctor to decide when somebody does not suffer from MCS which is one of the main reasons why MCS is regarded skeptically by mainstream medicine.")  Plaintiffs, however, steadfastly maintain that the doctor's actual diagnosis is the universally recognized "chemical sensitivity."

The trial court ultimately concluded that Dr. Johnson's diagnosis was in fact MCS. Thus, the court ruled his testimony inadmissible under Fed. R. Evid. 702 and Daubert. The district court's rationale was that Dr. Johnson performed none of the tests—"a scratch test, patch test, or a RAST test for IG antibodies"—used to confirm whether or not a patient is suffering from "chemical sensitivity."  Appellants' App. at 131.  Instead, Dr. Johnson relied on the patient's history, a physical examination, and the results of "Spect" and "Booth" tests.  The district court found that these latter tests "have been the subject of much criticism by the scientific community as not having met acceptable scientific levels of methodology and criteria, and are not designed to test for the recognized medical condition of chemical sensitivity."[6]  Id.  Plaintiffs do not dispute this finding, and we therefore may not disturb the court's conclusion that "the record does not demonstrate that Dr. Johnson has made a valid diagnosis of the generally accepted condition of chemical sensitivity based on objective testing."  Id.

---

[6]Additionally, the district court noted Dr. Chester's testimony regarding Dr. Johnson's propensity to use varying diagnostic terminology: "[He] take[s] the same illness, and [he has] used at least three different terms that I know of for that illness . . . [including] [m]ultiple chemical sensitivit[y], environmental illness and chemical sensitivity."  Appellants' App. at 129.

Of course, district courts must be careful not to "don the amateur scientist's cap in ruling on scientific validity." <u>Bradley</u>, 42 F.3d at 438 (citations and quotations omitted). But, trial judges remain free to determine as a threshold question whether an expert is in fact predicating her conclusions on the scientific theory, procedure, or principle on which she purports to rely. Were this not so, an expert whose opinion rests on faulty scientific underpinnings might be permitted to testify simply by placing an acceptable label on otherwise inadmissible "scientific knowledge."

We also affirm the district court's exclusion of Dr. Franks' testimony. The court found that Dr. Franks, as a psychologist, "is not an expert in the field of medicine or toxicology," <u>see</u> Appellants' App. at 132, and further found that her opinion was based in part on testing that was still "in the research stage and [had] not been validated," <u>id.</u> at 133. Plaintiffs provide us with no evidence indicating that the district court's resolution of this issue was in error.

### III

The district court denied plaintiffs' motion for a new scheduling order citing the untimeliness of their request and prejudice to defendant. Federal Rule of Civil Procedure 16(b) provides that schedules "shall not be modified except upon a showing of good cause and by leave of the district judge . . . ." "Nevertheless, while the pretrial order defines a lawsuit's boundaries in the trial court and on appeal, 'total inflexibility is undesirable.'" <u>Hull v. Chevron U.S.A., Inc.</u>, 812 F.2d 584, 588 (10th Cir. 1987) (citing

Fed R. Civ. P. 16 advisory committee's note). The decision to exclude evidence is a

drastic sanction. See Coleco Indus., Inc. v. Berman, 567 F.2d 569, 576 n.14 (3d Cir.

1977). Because district courts are given wide latitude in this area, we reverse only for

abuse of discretion. See Burks v. Oklahoma Publ'g Co., 81 F.3d 975, 978 (10th Cir.),

cert. denied, 117 S.Ct. 302 (1996).

Even according appropriate deference, we find reversible error in this case. Our

determination turns on four factors:

> (1) the prejudice or surprise in fact of the party against whom the excluded
> witnesses would have testified, (2) the ability of that party to cure the prejudice,
> (3) the extent to which waiver of the rule against calling unlisted witnesses would
> disrupt the orderly and efficient trial of the case or of other cases in court, and (4)
> bad faith or willfulness in failing to comply with the court's order.

Burks, 81 F.3d at 979 (quoting Smith v. Ford Motor Co., 626 F.2d 784, 797 (10th Cir.

1980)).

The first two factors favor granting plaintiffs' request to modify the scheduling

order and add Dr. Schreiber as a witness.[7] Defendant could hardly have been surprised

---

[7]We decline to reach a conclusion as to the propriety of excluding the testimony of Drs. Trese and McWatt. There is some question as to whether plaintiffs withheld the names of Drs. Trese and McWatt and their medical reports from the defendant. If this is determined to be the case, exclusion of testimony is a proper response to the discovery violations. See Orjias v. Louisiana-Pacific Corp., 31 F.3d 995, 1005 (10th Cir. 1994) (citing Fed. R. Civ. P. 37(c)). Neither the record nor the district court order clarify the situation, and thus we do not have sufficiently detailed findings to permit appellate review. See Krieger v. Gold Bond Bldg. Prods., 863 F.2d 1091, 1097 (2d Cir. 1988). As to Drs. Trese and McWatt, we therefore vacate the order denying plaintiffs leave to add them as witnesses, and remand for further proceedings in light of this opinion.

that plaintiffs would attempt to procure alternative expert testimony in the event the court granted defendant's motion to exclude the testimony of Drs. Johnson and Franks. In fact, defendant was already prepared to present expert testimony that plaintiffs were not suffering from chronic medical problems. Moreover, any prejudice to defendant could have readily been cured; the substance of Dr. Schreiber's testimony could have been established through deposition and by review of his reports.

We cannot conclude that the plaintiffs' request for a new scheduling order would have disrupted the trial—their motion was filed eighty days before its scheduled commencement. Cf. National Distillers and Chem. Corp. v. Brad's Mach. Prods., Inc., 666 F.2d 492, 497 (11th Cir. 1982) (finding twenty-one days notice of new witness prior to commencement of trial sufficient); Davis v. Duplantis, 448 F.2d 918, 921 (5th Cir. 1971) (finding eight days notice of testimony of witness not listed in pretrial order sufficient). Additionally, the plaintiffs acted promptly to find new experts. The district court entered the order excluding Drs. Johnson and Franks on August 25, 1995. The written motion for a new scheduling order was filed on September 15 and on September 19 the plaintiffs were examined by Dr. Schreiber. On October 25, Dr. Schreiber produced preliminary medical reports for both plaintiffs and on November 1, the date of the hearing on the motion for a new scheduling order, plaintiffs' counsel submitted these reports to the court and opposing counsel.

Thus, by the date of the hearing, the plaintiffs were prepared to present not only the identity of the proposed expert, but his preliminary conclusions as well. The presentation of Dr. Schreiber's preliminary reports was sufficient to put everyone concerned on notice that the subject matter of this proposed testimony would be different than that of the properly excluded testimony of Dr. Johnson. The reports prepared by Dr. Schreiber clearly indicate that both plaintiffs suffer from <u>objective</u> abnormalities which, in the case of Summers, he attributes to "toxic damage to his central and peripheral nervous system as a result of exposure to the fumes." Appellant's App. at 931. Even if Dr. Schreiber's testimony were to be excluded on <u>Daubert</u> review, it could not be excluded for the same reasons relied on to exclude Dr. Johnson's testimony. The district court noted that diagnoses of MCS, including that of the plaintiffs, rely on <u>subjective</u> symptoms "that cannot be attributed to any known condition, disorder, or disease." <u>Id.</u> at 130 (citation omitted). Dr. Schreiber's preliminary reports do not indicate such reliance.

Our review of the record reveals no bad faith or willful omissions on the part of plaintiffs. On the contrary, this dispute presents unique facts that demand reversal. Plaintiffs were referred to Drs. Johnson and Franks by defendant, their employer. To deny them the opportunity to acquire new expert witnesses after Johnson and Franks were excluded is unjust. Their disputed diagnoses were in part a function—albeit inadvertent—of defendant's actions. The district court's order denying the motion for a new scheduling order states "the plaintiffs were aware, at least as early as the beginning

-11-

of discovery, that defendant had repudiated the testimony and diagnosis of both Drs. Johnson and Franks." Appellants' App. at 142-43. That, however, was insufficient to put plaintiffs on notice that the testimony of both doctors would be excluded altogether. "Zeal to dispose of pending litigation, commendable in itself, [should not result] in deprivation of reasonable opportunity to make adequate preparation for trial." Sutherland Paper Co. v. Grant Paper Box Co., 183 F.2d 926, 931 (3rd Cir. 1950). The plaintiffs acted expeditiously in filing the motion for a new scheduling order and obtaining alternative medical testimony. Under these circumstances, the district court's decision to deny plaintiffs' motion without affording plaintiffs an opportunity to develop the testimony and subject it to further Daubert analysis was improvident. We reverse on that basis.

## IV

We review the district court's decision to give a particular jury instruction for abuse of discretion. Harrison v. Eddy Potash, Inc., 112 F.3d 1437, 1442 (10th Cir. 1997). The instructions given are reviewed de novo to determine whether, in their entirety, they correctly state the governing law. Id. "An erroneous jury instruction requires reversal only if we have substantial doubt whether the instructions, taken together, properly guided the jury in its deliberations." Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1424 (10th Cir. 1993) (quotations omitted).

The district court informed the jury that "for the plaintiffs to recover any damages under the Boiler Inspection Act [("BIA")], they must prove that their injury resulted in whole or in part from the defendant's violation of the [BIA]." Appellants' App. at 181 (emphasis added). Plaintiffs objected to this instruction, suggesting in its place language stating they were entitled to recover if the violation "played any part, no matter how small" in causing the injury. Id. at 383-84. On appeal, plaintiffs argue that the district court's failure to include the proposed language constitutes reversible error. We disagree.

Actions alleging a violation of the BIA are brought under the FELA. See Urie v. Thompson, 337 U.S. 163, 188 n.30 (1949). The standard of causation required in a BIA case is the same as the standard of causation required in a FELA negligence case. See, e.g., Oglesby v. Southern Pacific Transp. Co., 6 F.3d 603, 606 (9th Cir. 1993); Green v. River Terminal Ry. Co., 763 F.2d 805, 810 (6th Cir. 1985). Therefore, we are required to analyze the statutory language of the FELA and the case law interpreting it in order to determine whether the jury instruction given by the district court was correct as a matter of law. See Oglesby, 6 F.3d at 606.

The FELA provides:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, . . . or other equipment."

45 U.S.C. § 51 (emphasis added). During the first half of this century, it was customary for courts to analyze liability under the FELA in terms of proximate causation. See Page v. St. Louis Southwestern Ry. Co., 312 F.2d 84, 88 & n.2 (5th Cir. 1963) (citing cases). However, the Supreme Court definitively abandoned this approach in Rogers v. Missouri Pacific R.R., 352 U.S. 500 (1957), stating,

> Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury or death due "in whole or in part" to its negligence.

> The law was enacted because the Congress was dissatisfied with the common-law duty of the master to his servant. The statute supplants that duty with the far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer's negligence. The employer is stripped of his common-law defenses and for practical purposes the inquiry in these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit.

Id. at 506-08 (quoting 45 U.S.C. § 51) (second and third emphases added).

Following Rogers, several circuits have held that it is reversible error for a district court to instruct the jury in a FELA case as to causation using traditional common law

-14-

concepts rather than the standard imposed by the statute. See, e.g., Hausrath v. New York

Central R.R., 401 F.2d 634, 636-37 (6th Cir. 1968); Page, 312 F.2d at 92; DeLima v.

Trinidad Corp., 302 F.2d 585, 587-88 (2d Cir. 1962); Hoyt v. Central R.R., 243 F.2d 840,

843 (3d Cir. 1957).

This circuit has only once been presented with the issue. In Iannacito v. Denver &

Rio Grande Western R.R., 380 F.2d 1019 (10th Cir. 1967), the plaintiff argued that

references to "the proximate cause" in jury instructions that also included "in whole or in

part" language were improper. Id. at 1021. Noting the plaintiff had failed to object to the

instruction at trial, this court concluded that "the instructions taken as a whole

understandably and correctly explained to the jury the applicable law." Id.

The critical distinction between the instant dispute and the decisions cited above is

that the instruction used by the district court in this case contains no proximate causation

language. In fact, the instruction does no more than quote the relevant statutory language

on causation and, therefore, cannot be a misstatement of the law. See Tyree v. New York

Central R.R., 382 F.2d 524, 526-27 (6th Cir. 1967) (noting that jury instruction that

included "in whole or in part" language "could not be subject to complaint inasmuch as it

specifically told the jury exactly what the statute provided").

It is true that a recitation of statutory language does not preclude a finding of error.

See Draeger v. Grand Central, Inc., 504 F.2d 142, 144 (10th Cir. 1974) (reading statute in

instructing jury "has been considered in some instances to be erroneous") (citing 9

Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2556, n.1 (1971)); <u>see also</u> <u>Structural Rubber Prods. Co. v. Park Rubber Co.</u>, 749 F.2d 707, 723 (Fed. Cir. 1984) (finding error in instruction that properly stated law but failed to clarify term not readily understood by jury). The refusal to accept an alternative jury instruction could still be an abuse of discretion if the one used misled or confused the jury. <u>See</u> <u>United States v. Voss</u>, 82 F.3d 1521, 1529 (10th Cir.), <u>cert. denied</u>, 117 S.Ct. 226 (1996). Appellants argue that the statutory language is misleading because a reasonable jury could misinterpret the phrase to require a showing of causation greater than the "no matter how small" standard explicated in <u>Rogers</u>. We do not agree.

A jury instruction containing both the statutory language and the explanatory language of <u>Rogers</u> is certainly the clearest articulation of the appropriate causation standard and presents the preferable approach in the future. <u>See</u> <u>Iannacito</u>, 380 F.2d at 1021. However, the use of the statutory language is not so misleading as to present a further basis for reversal. <u>See</u> <u>Coray v. Southern Pac. Co.</u>, 335 U.S. 520, 524 (1949) (stating that FELA's "in whole or in part" language is "simple and direct"); <u>see also</u> <u>Hausrath</u>, 401 F.2d at 637 ("The phrase 'resulting in whole or in part' was <u>obviously</u> designed to make even more explicit that negligence of an employer did not have to be the sole cause or 'the proximate cause' of the injury in order to justify recovery.") (emphasis added); <u>Iannacito</u>, 380 F.2d at 1021.

We REVERSE the district court's order denying plaintiffs' leave to add Dr. Schreiber to the witness list, VACATE the order denying plaintiffs' leave to add Drs. Trese and McWatt to the witness list and REMAND for a new trial in light of this opinion. We AFFIRM as to all other issues.

**No. 96-7038, <u>Summers v. Missouri Pacific Railroad</u>**
**TACHA, J., dissenting**


I concur with Parts II and IV of the majority opinion. With respect to Part III, which reverses the denial of plaintiffs' motion to amend the scheduling order, I respectfully dissent. As this court noted in <u>Burks v. Oklahoma Pub. Co.</u>, 81 F.3d 975, 978 (10th Cir.), <u>cert. denied</u> 117 S. Ct. 302 (1996), "Federal Rule of Civil Procedure 16(b) gives district courts wide latitude in entering scheduling orders." That rule provides that "[a] schedule shall not be modified <u>except upon a showing of good cause</u> and by leave of the district judge." Fed. R. Civ. P. 16(b) (emphasis added). Because plaintiffs failed to make a threshold showing of good cause for amending the scheduling order, I would affirm the district court's decision on this issue.

When a party seeks an amendment of the scheduling order so that he can substitute a new expert witness in place of one the court has excluded, that party must put forth some sort of showing that the proposed witnesses can provide testimony different from that which already has been rejected by the court as part of the requisite "good cause" for amending the schedule. Otherwise, the court would be required to constantly amend the scheduling order to include new substitute witnesses regardless of whether they ultimately could provide admissible testimony. As the majority discusses in Part II, the district court here performed a very thorough <u>Daubert</u> analysis regarding the proposed testimony of plaintiffs' original medical experts, Drs. Johnson and Franks. As a result of that analysis, the court decided not to allow their testimony. When plaintiffs moved for a new

scheduling order to permit Dr. Schreiber to appear as a witness, they made no proffer to show that his testimony would be different from that already examined and rejected by the district court. Neither plaintiffs' written motion nor their attorney's statements at the motions hearing purport to explain how Dr. Schreiber's testimony would differ from that of the excluded witnesses or how it would meet the <u>Daubert</u> standard. In fact, the plaintiffs' attorney said:

> Your Honor, I'm not here to tell you that the testimony of Dr. Schreiber will meet with your requirements and interpretation of <u>Daubert</u>. I don't know that. I mean, all we have is a preliminary report . . . .

Hearing Tr. at 12 (Nov. 1, 1995). Perhaps more importantly, an examination of Dr. Schreiber's report for plaintiff Jon Bradley Summers reveals no significant difference between it and the rejected reports of Dr. Johnson. The majority states that "Dr. Johnson's diagnosis was toxic exposure to diesel fumes resulting in injury to the central nervous and respiratory systems, causing 'chemical sensitivity.'" Majority Op. at Pt. I. Dr. Schreiber's diagnosis for Mr. Summers is very similar. According to Dr. Schreiber's report, "it is obvious that Mr. Summers has suffered toxic damage to his central and peripheral nervous system as a result of the exposure to the fumes while working for the railroad." <u>See</u> Appellant's App. at 931. While he does not go so far as to put a label such as "chemical sensitivity" on Mr. Summers' condition as did Dr. Johnson, this omission is not dispositive. Just as an expert "whose opinion rests on faulty scientific underpinnings" should not be "permitted to testify simply by placing an acceptable label

-2-

on otherwise inadmissible 'scientific knowledge,'" Majority Op. at Pt. II, neither should testimony be admitted simply because the expert declines to give it any label at all. In short, when they offered Dr. Schreiber's testimony, plaintiffs did not produce any additional scientific information that would prompt a need for the district court to conduct a fresh <u>Daubert</u> analysis for Dr. Schreiber.

Because plaintiffs failed to show that Dr. Schreiber's testimony would differ in any significant respect from the testimony the judge had already excluded, they failed to make a threshold showing of good cause for a change in the scheduling order. Absent such a showing, it is not necessary for us to address the four factors set out in <u>Burks</u>, 81 F.3d at 979, which the majority analyzes in Part III of its opinion. I would hold that the trial court did not abuse its discretion when it denied plaintiff's motion to amend the scheduling order.